NOV 19 2024 PM3:08
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE TRACKING OF THE TARGET VEHICLES | Case No.  3:24mj1044 (SDV) <br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR SEARCH WARRANTS**

I, Andrew Pappas, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses, including but not limited to controlled-substances offenses and money-laundering offenses.

2.     I am a Special Agent with the Federal Bureau of Investigation (hereinafter the "FBI") and have been since March 2019.  I am a graduate of the FBI Training Academy in Quantico, Virginia where I received training in white-collar crime, cyber-crime, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics. I am a Marine Infantry and Force Reconnaissance officer.  As part of my responsibilities in that position, I lead Marines in the execution of raids, searches, surveillance operations, and interviews during training and combat operations.  While deployed, my unit's operations involved stopping and searching vehicles for contraband, including weapons, drugs, and explosives material.

3.     During my time as an FBI special agent, I have participated in numerous criminal investigations, including investigations into suspected homicides, armed robberies, narcotics trafficking, firearms trafficking, violent criminal activity, racketeering, money laundering, and

securities fraud.  My participation in these investigations has included assisting in the controlled purchase of narcotics utilizing confidential informants and cooperating witnesses; participating in the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to narcotics trafficking and cybercrimes; reviewing and analyzing cellular records and cell site information; and interviewing individuals and other members of law enforcement regarding the manner in which cyber criminals deceive and extort their victims.  I have led investigations into organized criminal enterprises, including violent street gangs and large-scale narcotics trafficking organizations. I have led and participated in multiple Title III wiretap investigations into violent criminal enterprises and drug trafficking organizations. I have attended gang and narcotics trainings sponsored by federal law enforcement.  Finally, I have participated in investigations involving the use of court-authorized interception of wire and electronic communications.

4.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  I have personally participated in the investigation concerning violations of the federal laws listed herein.

5.      Based on my training and experience set forth, I am familiar with methods employed by members of violent criminal enterprises ("VCEs") and drug trafficking organizations ("DTOs") in furtherance of their illegal businesses. I am familiar with the manner and means commonly employed by narcotics traffickers, firearms traffickers, members of criminal street gangs, and members of criminal organizations to communicate and to otherwise facilitate and carry out criminal activity and avoid detection by law enforcement.  I am also

2

aware of efforts those involved in crime make to thwart or detect surveillance, both physical and electronic.

6.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the following:

a.  The  renewal of a GPS tracking device on a black 2011 Mercedes E350 with Connecticut registration BL04484 (herein referred to as "**TARGET VEHICLE 1**"), registered to and operated by DARREN EBRON of 682 Shelton Street, Bridgeport, CT;

b.  The installation of a GPS tracking device on a gray, newer model Infiniti Sedan (possibly a Q50 sedan) bearing stolen Connecticut registration BL95957 (herein referred to as "**TARGET VEHICLE 2**"), operated by DARREN EBRON of 682 Shelton Street, Bridgeport, CT; and

c.  The installation of a GPS tracking device on a 2015 gray Audi A3 with Connecticut registration BH12153 (herein referred to as "**TARGET VEHICLE 3**"), operated by DARREN EBRON of 682 Shelton Street, Bridgeport, CT and registered to Sherisa Lynch (EBRON's girlfriend) of 9 Harvey Street, Bridgeport, CT.[1]

7.      Based on the facts set forth in this affidavit, I believe that DARREN EBRON operates the **TARGET VEHICLES** in furtherance of violations of Title 21 U.S.C. § 846 (Conspiracy and Attempts to Distribute Controlled Substances); 21 U.S.C. § 841(a)(1) (Unlawful Possession with Intent to Distribute, Distribution and/or Manufacture of Controlled Substances) (collectively the "Subject Offenses").  Additionally, there is probable cause to believe, and I do believe that installation of tracking devices on the **TARGET VEHICLES** and use of the tracking devices will lead to obtaining evidence, fruits, and instrumentalities of the Subject Offenses as well as to the identification of individuals who are engaged in the commission of those and related crimes, and locations used in relation to the Subject Offenses.

---

[1] Collectively referred to as the "**TARGET VEHICLES.**"

3

8.      As a result of my personal participation in this investigation, including the analysis of reports provided to me by other Special Agents, Task Force Officers, other members of the FBI, and/or members of the BPD; physical surveillance of suspected criminal activity; analysis of telephone toll information; debriefings of cooperating witnesses and sources of information; controlled purchases of narcotics; consensual recordings; and the review of other reports and documents, I am familiar with the facts and circumstances of the Subject Offenses. Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and part and, where applicable, are based on draft transcripts.

9.      Since this Affidavit is being submitted for the limited purpose of securing the installation and monitoring of tracking devices on the **TARGET VEHICLES**, I have not included each and every fact known to me concerning this investigation. I have set forth the facts that I believe are essential to establish probable cause for the requested tracking warrant. Unless otherwise specified, all times referenced in this affidavit are in Eastern Time (ET).

## **JURISDICTION**

10.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. See 18 U.S.C. § 2711(3)(A)(i).

## **FACTS AND CIRCUMSTANCES SUPPORTING PROBABLE CAUSE**

11.      Since 2022, the Bridgeport Police Department ("BPD") Tactical Narcotics Team ("TNT") has conducted an ongoing investigation into ROBERT REYES, who is a convicted felon, and his associates for drug trafficking and the possession of illegal firearms at 295 Shelton Avenue, Bridgeport and the surrounding buildings.  BPD executed multiple search warrants and

made multiple arrests and convictions for these offenses and for the illegal discharge of firearms from 2022 until the present, including ANGEL ECHEVARRIA, who is the subject of an FBI investigation described below.

### Narcotics Trafficking around 678 Noble Avenue, Bridgeport

12.    The Federal Bureau of Investigation ("FBI") Bridgeport Safe Streets Task Force ("BSSTF") and the Connecticut State Police ("CSP") Statewide Narcotics Task Force have conducted a joint investigation into the drug trafficking and firearms possession in the area of 678 Noble Avenue and 284 Shelton Street.  Since the arrest and probation of ROBERT REYES, the residence of 295 Shelton Street has been vacated by REYES and his associates, however 678 Noble Avenue remains a hub for drug trafficking.

13.    In March and April of 2024, the FBI BSSTF conducted three controlled narcotics purchases with a reliable Confidential Human Source ("CHS") deployed with government funds and audio/video consensual monitoring devices and under the surveillance of law enforcement. At law enforcement's direction, the CHS purchased approximately 127 folds of presumptive heroin/fentanyl folds sold by LUIS PACHECO, a.k.a. "Flaco." PACHECO is a street level drug distributor that operates in an open-air market in the area of what would be 284 Shelton Street, which is partially enclosed by a wood fence and the brick wall of 294 Shelton Street. PACHECO dealers either sell from this partially concealed area or from within a vehicle parked in front of 284 Shelton Street.  294 Shelton Street is adjacent to 284 Shelton Street and appears to be an unused vehicle maintenance garage.  Adjacent to 294 Shelton Street is a white door which leads to the upstairs apartment of 678 Noble Avenue.

14.    In April 2024, BSSTF conducted a controlled purchase of narcotics, utilizing a CHS, from ANGEL ECHEVARRIA, brokered by LUIS PACHECO, for approximately 22

grams of suspected fentanyl powder. During the controlled purchase from ECHEVARRIA, PACHECO provided the CHS with a phone number to call to complete the purchase of heroin and requested the CHS tip him for referring the CHS to his supplier. PACHECO said the individuals in 678 Noble Avenue did not want the CHS waiting on the street, so they sent the CHS straight to the supplier. When the CHS dialed the phone number provided by PACHECO, a male answered and identified himself as "Frenchie," and directed the CHS to go to 1590 Barnum Avenue, Bridgeport, where "Frenchie" met the CHS and sold him 22.4 grams of white powder that field tested positive for fentanyl. The CHS then returned to the area of Noble Avenue and Shelton Street and paid PACHECO $200 as a referral fee. Law enforcement identified "Frenchie" as ANGEL ECHEVARRIA based on subscriber and toll records, physical surveillance and photograph matching, and arrest reports.

### Narcotics Trafficking by ANGEL ECHEVARRIA

15.     In April through July of 2024, BSSTF conducted five controlled narcotics purchases from ANGEL ECHEVARRIA, brokered by LUIS PACHECO, for approximately 226 grams of suspected fentanyl powder.

### Identification of ECHEVARRIA's Narcotics Supplier

16.     In early August of 2024, BSSTF utilized a CHS to conduct a phone call to ECHEVARRIA to identify a new source of supply. ECHEVARRIA advised the CHS about a black male being his main supplier.

17.     In early August of 2024, BSSTF conducted a controlled purchase of narcotics from ECHEVARRIA utilizing a CHS. The CHS coordinated with ECHEVARRIA the purchase of 50 grams of fentanyl. ECHEVARRIA directed the CHS to go to 329 Pearl Street, Bridgeport, Connecticut to complete the purchase. During the controlled buy, law enforcement observed

ECHEVARRIA accompanied by an unknown black male. The unknown black male was observed handing a bag to ECHEVARRIA, who then provided it to the CHS. This was determined to be the bag the CHS received with the 50 grams of presumed fentanyl inside. During the meeting, the unknown black male identified himself as "D" and provided the phone number 203-953-9257. The individual, "D," was later identified by investigators as EBRON.

18.      ECHEVARRIA was incarcerated on September 11, 2024, and referred the CHS to EBRON to conduct future purchases of narcotics, which are described below.

### *Narcotics Trafficking by EBRON*

19.      On September 15, 2024 EBRON placed a missed call to CHS-1 at approximately 6:34 PM ET, and then texted CHS-1 "Angel man's hit me" at approximately 6:35 PM ET. EBRON placed another missed call to CHS-1 that day, and in lieu of texting EBRON back, CHS-1 returned EBRON's call, and they spoke for approximately one minute and eleven seconds. During the call, EBRON offered to sell CHS-1 fentanyl at the price of $60 per gram of cut narcotics and $65 per gram of raw narcotics.[2]

20.      Based on my training and experience, and knowledge of this investigation, I believe EBRON texted CHS-1 to request a phone call to arrange a drug deal, which they subsequently discussed on the phone.

21.      On September 18, CHS-1 contacted EBRON over the phone to arrange the controlled drug purchase, and EBRON directed CHS-1 to go to ECHEVARRIA's residence, located at 329 Pearl Avenue in Bridgeport.

---

[2] EBRON contacted CHS-1 at a time and place when law enforcement was not present, and CHS-1 was unable to employ a recording device. CHS-1 contacted your affiant immediately after the call, and detailed the conversation as provided in this affidavit, as well as a screenshot of CHS-1 cellular device showing two missed calls and the connected call. EBRON later sold the CHS drugs at the quoted price of $60 per gram.

22.    Upon CHS-1 arriving at the buy location, EBRON entered CHS-1's vehicle and provided CHS-1 with approximately 50 grams of suspected fentanyl powder in a clear knotted bag from within his pants waste band in exchange for $3000 of government funds. During the controlled purchase, law enforcement observed the black male who entered CHS-1's vehicle remain in the vehicle for three to five minutes, and then exit CHS-'s vehicle and enter **TARGET VEHICLE 1.**

23.    On October 8, 2024, CHS-1 texted EBRON on his cellular device to coordinate the purchase of drugs the following day. On October 9, 2024, starting at approximately 7:23 PM, EBRON used his cellular device to text CHS-1 about where to meet him to conduct the drug deal.

24.    Later that day, CHS-1 conducted a controlled purchase of approximately 50 grams of fentanyl from EBRON. In conjunction with the consensual recordings described above, law enforcement followed EBRON directly from his address at 682 Shelton Street, Bridgeport, CT in **TARGET VEHICLE 1** directly to the buy location at 1459 Stratford Avenue, Bridgeport, CT. Law enforcement observed EBRON **TARGET VEHICLE 1** and enter CHS-1's vehicle. The consensual audio/video recording device captured video of a black male wearing a grey sweatshirt and sweatpants enter CHS-1's vehicle, which is the same clothing law enforcement observed EBRON wearing as he exited his residence. During the controlled buy, EBRON provided CHS-1 approximately 50 grams of a hard, brownish gray substance purported to be raw fentanyl in exchange for government funds. EBRON also offered to sell CHS-1 cocaine at a price of $600 per gram, and stated he would bring CHS-1 a sample during their next meeting. At the conclusion of the controlled buy, your affiant, who conducted physical surveillance of the controlled buy, observed **TARGET VEHICLE 1** depart the area of 1459 Stratford Avenue.

8

Agents met with CHS-1, who provided the fentanyl in two clear knotted plastic bags to law enforcement.

25.    On November 12, 2024, at the direction of law enforcement, CHS-1 conducted a controlled drug purchase of approximately 105 grams of suspected fentanyl. That controlled buy is described in the probable cause section set forth below regarding **TARGET VEHICLE 2**.

### Title III Investigation into EBRON and his Associates

26.    On November 4, 2024, the Honorable District Judge Kari. A. Dooley signed a Federal Title III wiretap order authorizing the intercept of two target telephones for 30 days, one of which is 203-953-9257 used by DARREN EBRON, which became active at 8:00 AM on November 5, 2024.[3] The FBI BSSTF has used the intercepted wire and electronic communications on EBRON's phone in conjunction with physical surveillance to identify the facilities of EBRON's drug trafficking, to include his use of the **TARGET VEHICLES,** which is described in the following paragraphs.

### Probable Cause for TARGET VEHICLE 1

27.    On October 15, 2024, the Honorable S. Dave Vatti, U.S.M.J. signed a federal search warrant in the District of Connecticut authorizing the installation of a GPS tracking device on **TARGET VEHICLE 1** until November 29, 2024. **TARGET VEHICLE 1** is a black 2011 Mercedes E350 with Connecticut registration BL04484. EBRON continued to use **TARGET VEHICLE 1** for drug trafficking, as set forth below.

---

[3] The other target telephone was used by JAIME SANTIAGO, a dealer who EBRON supplied, but was ousted from the DTO approximately two days prior to the interception of his telephone, and therefore the target telephone provided no relevant investigative content here.

28.    Specifically, on November 5, 2024 between 6:10 PM and 6:40 PM, agents intercepted a phone call between EBRON and phone number 321-339-6237, identified as Barbara Jackson, during which EBRON discusses picking up "pinks and greens" from Jackson, which I believe is a reference to pills containing narcotics. EBRON advised Jackson he would meet her outside, which I believe to be a reference to her residence. Based on a previous 2023 Title III investigation by the FBI BSSTF and controlled drug buys by a DEA source in 2023, I know Jackson served other customers from her address at 1589 Fairfield Avenue Apartment 1, Bridgeport, CT. At 6:40 PM, agents intercepted a call during which EBRON advised Jackson that he was outside. In conjunction with that call, at 6:41 PM surveillance observed **TARGET VEHICLE 1** parked with the lights on at the intersection of Fairfield Avenue and Hancock Avenue, which is the location of Jackson's residence. At 6:43 PM, surveillance observed **TARGET VEHICLE 1** depart the area.

29.    Based on my training, experience, and knowledge of this investigation, I believe EBRON drove to Jackson's residence at 1589 Fairfield Avenue, Bridgeport in **TARGET VEHICLE 1** to pick up pills containing narcotics.

30.    Similarly, on November 6, 2024, between 12:54 PM and 2:13 PM, agents intercepted wire and electronic communications between EBRON and Joseph Villafane about Villafane purchasing "two paper" and "forty hard." EBRON and Villafane then plan to meet at 95 Kasper Circle, Stratford, CT, which is the residence of Jessica Villafane, whom law enforcement believes is Joseph Villafane's step mother. Based on my training, experience, and knowledge of this investigation, I believe "paper" is a reference to paper folds containing heroin powder and "hard" to be a reference to crack-cocaine. In conjunction with the intercepted communications, law enforcement conducted surveillance and observed the following: At 1:42

PM, agents observed, via CCTV, **TARGET VEHICLE 1** exit the driveway of 682 Shelton Street, Bridgeport. At approximately 2:00 PM, agents observed a white female operating a white SUV with Connecticut registration parked in front of 95 Kasper Circle, Stratford. At approximately 2:06 PM, agents observed Joseph Villafane exit 95 Kasper Circle and enter the passenger seat of the white SUV. Agents observed the white SUV and both occupants depart the area at 2:09 PM. At 2:16 PM, officers observed **TARGET VEHICLE 1** parked in front of 95 Kasper Circle.[4] At 2:18 PM, the white SUV with the white female operator and Villafane passenger returned to 95 Kasper Circle. Agents witnessed Villafane exit the white SUV and enter the passenger seat of **TARGET VEHICLE 1.**

31.     Based on my training, experience, and knowledge of this investigation, I believe EBRON drove **TARGET VEHICLE 1** to 95 Kasper Circle, Stratford, to sell heroin and crack-cocaine to Joseph Villafane.

32.     On November 9, 2024, between 5:41 PM and 6:11 PM, agents intercepted wire communications between EBRON and Jackson, during which EBRON coordinated the purchase of "10's" that are also "M's" from Jackson, which I believe based on my training and experience are likely either diverted 10 mg oxycodone pills or counterfeit 10 mg pills containing fentanyl or another synthetic opioid.  At 6:11 PM, agents intercepted a call from EBRON to Jackson in which he advises her that he arrived, which I believe to mean he arrived to her residence at 1589 Fairfield Avenue, Apartment 1, Bridgeport, CT (previously described). In conjunction with the intercepted calls, law enforcement conducted physical surveillance, and at approximately 6:15

---

[4] Due to the difficulties in conducting static surveillance at the location, agents did not observe **TARGET VEHICLE 1** park at 95 Kasper Circle, just that it was parked there by 2:16 PM.

PM, observed **TARGET VEHICLE 1** parked at the intersection of Mountain Grove Street and Fairfield Avenue, which is approximately two blocks from Jackson's apartment building.

33.     Based on my training and experience, I believe EBRON drove **TARGET VEHICLE 1** to Jackson's residence to purchase pills containing narcotics.

34.     On November 10, 2024 at 9:57 AM, agents intercepted communications between EBRON and Villafane about Villafane purchasing a "ball" for 190, which I believe to mean an eighth of an ounce of cocaine for $190, which is approximately 3.5 grams and a typical street level price for that quantity of cocaine. Villafane continued to explain how he cuts the narcotics that EBRON gives him, and how he makes money from it. Villafane then told EBRON that his customers are looking for the purple and blue rock, and EBRON said he will have the gray stuff on Tuesday. They then plan to meet at club Medusa, which I know to be in the area of Bishop Avenue and Barnum Avenue in Bridgeport. In conjunction with these calls, law enforcement conducted surveillance and observed the following: At 10:05 AM, law enforcement observed EBRON retrieve unknown items from the driver side door of **TARGET VEHICLE 1** parked outside of 682 Shelton Street, Bridgeport, and then returned to the driveway of 682 Shelton Street. At 10:07 AM, law enforcement observed **TARGET VEHICLE 2** exit the driveway of 682 Shelton Street. At 10:13 AM, officers observed **TARGET VEHICLE 2** enter the gas station at 1789 Barnum Avenue. At 10:12 AM, agents intercepted a call from EBRON to Villafane advising that he (EBRON) had arrived. At 10:14 AM, officers observed EBRON exit **TARGET VEHICLE 2** and enter a white Kia with Connecticut registration BR69184, registered to Michelle Rosario of 95 Kasper Circle, Stratford, CT. At 10:24 AM, officers observed the same white Kia parked outside of 95 Kasper Circle, Stratford.

35.     Based on my training, experience, and knowledge of this investigation, I believe Villafane ordered a quantity of cocaine from EBRON, who retrieved the drugs from **TARGET VEHICLE 1**, and then immediately drove **TARGET VEHICLE 2** to meet Villafane to sell him drugs.

### Probable Cause for TARGET VEHICLE 2

36.     **TARGET VEHICLE 2 is** a gray, newer model Infiniti Sedan (possibly a Q50 sedan) bearing stolen Connecticut registration BL95957. **TARGET VEHICLE 2** is usually parked in the driveway of 682 Shelton Street, which is EBRON's residence.  See paragraphs 34 and 35 for probable cause pertaining to **TARGET VEHICLE 2** on November 10, 2024.

37.     On November 11, 2024 starting at 3:06 PM, agents intercepted communications between EBRON and Villafane in which they coordinate a drug transaction. Villafane requested a "half ball," which I believe to be half of an eighth of an ounce of cocaine, or 1.75 grams of cocaine. EBRON directed Villafane to meet him on Dean Place by the Duchess near Beardsley Park.  Between 4:27 PM and 4:30 PM, EBRON and Villafane exchange wire and electronic communications, during which EBRON explained to Villafane where to meet him. In conjunction with the intercept of these calls, law enforcement conducted surveillance on EBRON and Villafane. At approximately 4:12 PM, officers observed Villafane exit 95 Kasper Circle, Stratford, and enter the driver door of the white Kia with Connecticut registration BR69184, previously described in this affidavit, and maintained surveillance on the white Kia until it arrived at Dean Place at approximately 4:33 PM. Simultaneously, law enforcement maintained continuous surveillance on **TARGET VEHICLE 2,** which departed 682 Shelton Street and drover directly to Dean Place, Bridgeport. At 4:33 PM, officers observed Villafane exit the white

Kia and approach the passenger side of **TARGET VEHICLE 2**. At 4:34 PM, **TARGET VEHICLE 2** departed the area.

38.     Based on my training, experience, and knowledge of this investigation, I believe EBRON operated **TARGET VEHICLE 2** from 682 Shelton Street directly to Dean Place to meet Villafane and sell him a quantity of cocaine.

39.     On November 11, 2024 at approximately 5:38 PM, agents intercepted communications from Villafane to EBRON in which Villafane requested another "half ball" from EBRON. EBRON directed Villafane to meet him at Shelton Street and Pembroke Street, which is approximately three or four houses from 682 Shelton Street. At 6:23 PM, Villafane called EBRON and told EBRON that he had arrived at Shelton Street and Pembroke Street in a blue Lexus. At 5:48 PM, physical surveillance officers observed EBRON sitting in **TARGET VEHICLE 2** parked in the driveway of 682 Shelton Street. Officers observed the driver side door open, and no other occupants in the vehicle. At approximately 6:24 PM, officers observed a blue Lexus with Connecticut registration 00VMPU parked at the intersection of Pembroke Street and Shelton Street. Officers observed EBRON exit the driveway of 682 Shelton Street and approach the passenger side window of the blue Lexus. Officers then observed EBRON return to 682 Shelton Street and enter the driver side door of **TARGET VEHICLE 2**.

40.     Based on my training, experience, and knowledge of this investigations, I believe EBRON maintained his drugs in **TARGET VEHICLE 2**, and then walked from the vehicle to meet Villafane and sell him a quantity of cocaine. EBRON then returned to **TARGET VEHICLE 2**, with what I believe to be the illicit proceeds of a drug transaction.

41.     On November 12, 2024 at 4:49 PM, agents intercepted wire communications between EBRON and Jackson during which EBRON coordinated the purchase of "pinks" from

14

Jackson, which I believe to be pills containing narcotics. In conjunction with these intercepted communications, law enforcement conducted surveillance. At 4:40 PM, officers observed **TARGET VEHICLE 1** park in the driveway of 682 Shelton Street. Almost simultaneously, a dark colored van parked near the driveway of 682 Shelton Street and a black male wearing black clothing exited the van and entered the passenger seat of **TARGET VEHICLE 2. TARGET VEHICLE 2** then exited the driveway of 682 Shelton Street. At 5:10 PM, EBRON called Jackson and told her he is at the door, which I believe to mean that EBRON had arrived at Jackson's residence at 1589 Fairfield Avenue, Bridgeport, CT. At 5:12 PM, officers observed a black male matching the description of EBRON enter 1589 Fairfield Avenue, which is the apartment building in which Jackson resides. At 5:12 PM, officers observed EBRON exit the building and walk to a bodega store, and then to **TARGET VEHICLE 2.**

42.    Based on my training, experience, and knowledge of this investigation, I believe EBRON drove **TARGET VEHICLE 2** with an unknown male to purchase narcotic pills from Jackson at 1589 Fairfield Avenue.

**Probable Cause for TARGET VEHICLE 3**

43.    **TARGET VEHICLE 3** is a 2015 gray Audi A3 with Connecticut registration BH12153 and is currently registered to Sherisa Lynch of 9 Harvey Street, Bridgeport, CT. **TARGET VEHICLE 3** is usually parked on the street or in the driveway of 682 Shelton Street, which is EBRON's residence, or at 9 Harvey Street, which is the residence of EBRON's girlfriend, Sherisa Lynch, where EBRON spends most nights. On November 13, 2024, at 7:26 PM, agents intercepted communications between EBRON and Marvette Bell during which they appear to coordinate a drug transaction. Bell is an apparent drug user and drug tester for EBRON who resides at 1423 Pembroke Street, Bridgeport. During the intercepted communications, Bell

15

told EBRON she was at the store, and EBRON responded that he was crossing the bridge by the city center and acknowledged that she was at the store. At 7:36 PM Bell called EBRON again, and EBRON told Bell that he had arrived. In conjunction with these intercepted calls, law enforcement conducted physical surveillance and observed an older female driver in a green Pontiac with Connecticut registration BE90969 parked near Los Muchachos market at 1325 Pembroke Street[5]. Law enforcement observed a male approach the green Pontiac, which departed shortly after and drove north on Pembroke Street. Officers then observed **TARGET VEHICLE 3** idling near Los Muchachos. At 7:45 PM, officers observed **TARGET VEHICLE 3** idling in front of 682 Shelton Street, which is approximately two blocks from Los Muchachos. At 7:47 PM, officers observed the green Pontiac at 1423 Pembroke Street, which is Bell's residence per DMV records.

44.     Based on my training, experience, and knowledge of this investigation, I believe Bell purchased a quantity of drugs from EBRON, who delivered them to Bell via **TARGET VEHICLE 3**.

45.     On November 14, 2024, starting at 10:41 AM, agents intercepted telephonic communications between EBRON and Villfane, during which Villafane asked for a half bag and some paper. Based on my training and experience, I believe paper is a reference to paper folds containing heroin powder, and a bag to be a reference to a quantity of cocaine. At 11:16 AM, EBRON called Villafane to advise that he arrived. Law enforcement conducted surveillance in conjunction with the intercepted calls, and at approximately 11:17 AM, officers observed Villafane exit 95 Kasper Circle, Stratford, CT. At approximately 11:21 AM, officers observed

_____

[5] According to CLEAR open-source database records, Connecticut Registration BE90969 is registered to Marveter Bell, which is the name listed on Bell's DMV record.

**TARGET VEHICLE 3** park in the driveway of 95 Kasper Circle and observed EBRON as the vehicle operator. Villafane approached **TARGET VEHICLE 3** and interacted with EBRON before returning to 95 Kasper Circle. EBRON departed the area in **TARGET VEHICLE 3.**

46.    Based on my training, experience, and knowledge of this investigation, I believe EBRON drove **TARGET VEHICLE 3** to Villafane's residence to sell him a quantity of drugs. I believe EBRON departed the location in **TARGET VEHICLE 3** possessing illicit proceeds from the drug sale.

47.    On November 16, 2024, starting at 11:20 AM, EBRON called Jackson, however the communications were not intercepted due to a technical error. Based on the almost daily communications between Jackson and EBRON about drug trafficking and EBRON's subsequent purchase of narcotics at Jackson's residence, law enforcement conducted physical surveillance at Jackson's residence. At 11:20 AM, officers observed **TARGET VEHICLE 3** park on Hancock Street. EBRON exited the vehicle and entered the front door 1589 Fairfield Avenue. At 11:22 AM, officers observed EBRON exit the side door of 1589 Fairfield Avenue and enter **TARGET VEHICLE 3** and the brake lights illuminated.

48.    Based on my training, experience, and knowledge of this investigation, I believe EBRON contacts Jackson on a near daily basis to request narcotic pills, then drives a vehicle to Jackson's residence, contacts Jackson via telephone to alert her of his arrival, and then enters her apartment building at 1589 Fairfield Avenue. Though agents did not intercept the content of the telephonic communications, based on the pattern described, I believe EBRON drove **TARGET VEHICLE 3** to purchase a quantity of narcotic pills from Jackson, and then returned to **TARGET VEHICLE 3** with the pills.

49.     On November 17, 2024, starting at 6:11 PM, agents intercepted telephonic communications between EBRON and Jackson in which EBRON requested to purchase "M's," which based on my training and experience is a reference to a pill containing narcotics, such as a counterfeit pill containing fentanyl, or a diverted prescription oxycodone pill. Jackson responded that she only had 12 left, and EBRON stated he would come immediately. At approximately 6:33 PM, EBRON called Jackson to tell her he was parking and would be at the door. In conjunction with these intercepted calls, law enforcement conducted physical surveillance of 1589 Fairfield Avenue, which is the apartment building in which Jackson resides. Officers observed **TARGET VEHICLE 3** park at the intersection of Fairfield Avenue and Hancock Avenue, and EBRON exited the vehicle and walked towards the entrance of 1589 Fairfield Avenue. EBRON entered the building at approximately 6:35 PM and exited at approximately 6:37 PM, then returned directly to **TARGET VEHICLE 3** and departed the area driving down Hancock Avenue.

50.     Based on my training, experience, and knowledge of this investigation, EBRON drove **TARGET VEHICLE 3** to make his almost daily purchase of narcotic pills from Jackson at her residence. I believe EBRON departed the area in **TARGET VEHICLE 3** in possession of narcotic pills.

### Necessity to Track the Location of Multiple Vehicles

51.     Throughout the first 14 days of the Title III interception of EBRON's telephonic communications and the supporting surveillance, EBRON has used three different vehicles to conduct his daily drug trafficking activities. Based on my training and experience, I know drug dealers will often rotate vehicles for which they use their drug trafficking operations in an effort to thwart detection by law enforcement. I believe EBRON, who is very surveillance conscious, is rotating his use of available vehicles for this purpose. Without the use of a vehicle GPS tracking

device on EBRON's vehicle, law enforcement is unable to safely or effectively ascertain his whereabouts during suspected drug trafficking operations. The GPS tracking devices will enable law enforcement to locate EBRON while mitigating the risk of detection, counter surveillance, and potential retaliation by EBRON. Finally, the use of GPS tracking devices on the **TARGET VEHICLES** will facilitate a safe and effective arrest of EBRON and the anticipated execution of search warrants on the **TARGET VEHICLES** in the coming weeks.

## CONCLUSION

52.     Based on my training and experience, as well as the experience of other law enforcement authorities involved in this investigation, and based on the facts set forth herein, I have reason to believe, and do believe, DARREN EBRON is a source of supply of narcotics for multiple customers, and purchases narcotics from multiple suppliers. I further believe EBRON has engaged, and will continue to engage, in criminal activity in violation of the subject offenses, and that EBRON will continue to use the **TARGET VEHICLES** in furtherance of the Subject Offenses.

53.     It is my belief that the installation and monitoring of a tracking device on the **TARGET VEHICLES** will facilitate physical surveillance of the **TARGET VEHICLES** and their operators and occupants, and it will constitute or lead to evidence of the Subject Offenses under investigation by helping investigators to ascertain, among other things, the source(s) of supply for the narcotics EBRON and his associates are distributing, other parties involved in this ongoing drug conspiracy, stash locations, assets and drug proceeds.

## AUTHORIZATION REQUEST

54.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that

authorizes members of the FBI or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device on the **TARGET VEHICLES** within the District of Connecticut within 10 days of the issuance of the proposed warrants, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the **TARGET VEHICLES** after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours, and/or move the **TARGET VEHICLES** to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device for a period of 45 days following the issuance of the warrants, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the District of Connecticut.

55.     In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrants delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

Respectfully submitted,

ANDREW PAPPAS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me on this _19th_ day of November, 2024 at Bridgeport, Connecticut.

HON. S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE